**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - :

**ELAINE L. CHAO**, Secretary of Labor
United States Department of Labor

         Plaintiff,

    v.

**CURRENT DEVELOPMENT CORPORATION,**
**GEORGE P. KLEIN, JR., INDIVIDUALLY,**
**AND AS TRUSTEE OF THE CURRENT**
**DEVELOPMENT CORPORATION PROFIT**
**SHARING PLAN AND OF THE CURRENT**
**DEVELOPMENT MONEY PURCHASE PLAN,**
**THE CURRENT DEVELOPMENT**
**CORPORATION PROFIT SHARING PLAN**
**AND THE CURRENT DEVELOPMENT**
**MONEY PURCHASE PLAN**

         Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - :

**CIVIL ACTION**

**FILE NO.**

**JUDGE LINDBERG**

**03C 1792**

**MAGISTRATE JUDGE SCHENKIER**

**DOCKETED**
MAR 1 3 2003

## COMPLAINT

    Plaintiff Elaine L. Chao, Secretary of Labor, United States Department of Labor (the "Secretary"), alleges:

### JURISDICTION AND VENUE

    1.    This action arises under Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. Sections 1001, et seq., and is brought by the Secretary under ERISA Sections 502(a)(2) and (5), 29 U.S.C. Sections 1132(a)(2) and (5), to enjoin acts and practices which violate the provisions of Title I of ERISA, to obtain appropriate equitable relief for breaches of fiduciary duty under ERISA Section 409, 29 U.S.C. Section 1109, and to obtain such

1

further equitable relief as may be appropriate to redress violations and to enforce the provisions of Title I of ERISA.

2.      This court has jurisdiction over this action pursuant to ERISA Section 502(e)(1), 29 U.S.C. Section 1132(e)(1).

3.      The Current Development Corporation Profit Sharing Plan and the Current Development Corporation Money Purchase Plan (collectively, the CDC Plans) are employee benefit plans within the meaning of ERISA Section 3(3), 29 U.S.C. Section 1002(3), which are subject to the provisions of Title I of ERISA pursuant to ERISA Section 4(a), 29 U.S.C. Section 1003(a).

4.      Venue of this action lies in the Northern District of Illinois, Eastern Division, pursuant to ERISA Section 502(e)(2), 29 U.S.C. Section 1132(e)(2), because the CDC Plans are administered in Elmhurst, Illinois, within this district.

## DEFENDANTS AND PARTIES IN INTEREST

5.      At all relevant times, Current Development Corporation (CDC), an Illinois corporation, was the sponsor of the CDC Plans and the employer of the employees covered by the CDC Plans; was responsible for the appointment of the members of the administrative committee for the CDC Plans; was a fiduciary of the CDC Plans within the meaning of ERISA Section 3(21)(A)(iii), 29 U.S.C. Section 1002(21)(A)(iii); and was a party in interest to the CDC Plans within the meaning of ERISA Section 3(14)(A) and (C), 29 U.S.C. Section 1002(14)(A) and (C).

6.      At all relevant times, George P. Klein, Jr., (Klein) was the trustee of the CDC Plans; was the president and sole stockholder of CDC, the employer of the employees covered by the CDC Plans; was a fiduciary of the CDC Plans within the meaning of ERISA §3(21)(A)(i) and (iii), 29 U.S.C. §1002(21)(A)(i) and (iii); and was a party in interest to the CDC Plans within the meaning of Section 3(14)(A), (E) and (H) of ERISA, 29 U.S.C. Section 1002(14)(A) (E) and (H).

7.      The CDC Plans are named as defendants herein pursuant to Rule 19(a) of the Federal Rules of Civil Procedure solely to assure that complete relief can be granted.

## VIOLATIONS

8.      Paragraphs 1 through 7 above are realleged and incorporated herein by reference.

9.      During the period from November 1997 through September 1999, Klein caused the CDC Plans to pay a total of $38,388.52 in legal fees incurred by CDC in connection with an administrative action filed by the Office of the Chief Accountant for the Department of Labor (OCA) against CDC for its failure to file annual reports. As a result of OCA's administrative action, the administrative law judge issued a decision and order holding, inter alia, that CDC had failed to file annual reports in violation of ERISA Section 502(c)(2).  The administrative law judge's decision and order is attached hereto and made a part hereof as Exhibit A.  The $38,388.52 in legal fees incurred by CDC in connection with the administrative action filed by the OCA, plus interest, was returned to the CDC Plans on November 14, 2002, but, on information and belief, has never been reimbursed to the persons who were participants in the CDC Plans during the period from November 1997 through September 1999, the period during which the legal fees were incurred.

10.     By the conduct described in paragraphs 8 and 9 above, Klein:

a.      failed to discharge his duties with respect to the CDC Plans solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA §404(a)(1)(A),  29 U.S.C. §1104(a)(1)(A);

b.      caused the CDC Plans to engage in a transaction that he knew or should have known constituted a sale or exchange of property between the plans and a party in interest in violation of

ERISA Section 406(a)(1)(D), 29 U.S.C. Section 1106(a)(1)(D); and

    **c.**      dealt with the assets of the CDC Plans in his own interest and for his own account in violation of ERISA Section 406(b)(1), 29 U.S.C. Section 1106(b)(1).

    **15.**      CDC is liable as a co-fiduciary under ERISA Sections 405(a)(1) and (3), 29 U.S.C. Section 1105(a)(1) and (2). CDC, through Klein, had knowledge that the legal fee payments incurred by it in connection with an administrative action filed against it for its failure to file annual reports were made by the CDC Plans on its behalf; and that, notwithstanding that the administrative law judge found CDC to be in violation of ERISA Section 502(c)(2) for its failure to file annual reports, no reimbursement of the legal fee payments was ever made to the CDC Plans.

**PRAYER FOR RELIEF**

    WHEREFORE, the Secretary prays for judgment:

    **A.**      Permanently enjoining defendants Klein and CDC from violating the provisions of Title I of ERISA;

    **B.**      Removing defendants Klein and CDC from any positions they now hold as fiduciaries of the CDC Plans;

    **C.**      Permanently enjoining defendants Klein and CDC from serving as fiduciaries to any ERISA-covered employee benefit plan;

    **D.**      Appointing an independent fiduciary to ensure the proper administration of the CDC Plans;

    **E.**      Ordering defendants Klein and CDC to correct the prohibited transactions in which they engaged;

    **F.**      Ordering defendants Klein and CDC to disgorge any profits they received and to restore any losses, including interest, incurred by the CDC Plans as a result of the fiduciary

breaches committed by them or for which they are liable;

    **D.**    Awarding the Secretary the costs of this action; and

    **E.**    Ordering such further relief as is appropriate and just.

 

**HOWARD RADZELEY**
Acting Solicitor of Labor

**RICHARD J. FIORE**
Regional Solicitor

**PETER D. BROITMAN**
Senior Trial Attorney

**P.O. ADDRESS:**
Office of the Solicitor
U.S. Department of Labor
230 South Dearborn Street
Eighth Floor
Chicago, Illinois 60604
Telephone:   (312)353-4454

Attorneys for Elaine L. Chao,
Secretary of Labor, United
States Department of Labor,
Plaintiff

5

U.S. Department of Labor   Office of Administrative Law Judges
525 Vine Street, Suite 900
Cincinnati, OH 45202

Telephone: (513) 684-3252
Facsimile: (513) 684-6108



Date:   FEB 22 2000
Case No: 1996-RIS-67

In the Matter of:

U.S. DEPARTMENT OF LABOR
PENSION AND WELFARE BENEFITS ADMINISTRATION,
    Complainant

    v.

CURRENT DEVELOPMENT CORPORATION,
    Respondent

Appearances:
Stevan Durovic, Office of the Solicitor
U.S. Dept. of Labor, Washington, D.C.
    For Complainant

Anthony S. Graefe & Associates
Chicago, IL
    For Respondent

Before:   THOMAS F. PHALEN, JR.
          Administrative Law Judge

## DECISION AND ORDER

This a case of first impression after a full hearing on the alleged failure by Respondent to abide by the terms of a settlement agreement. It provided for payment of civil penalties due to the failure to timely submit the compromised penalty payment under the terms of the agreement, and for the failure to timely file Form 5500 C/R's and participant beneficiary statements under Section 502(c)(2) of the Employee Retirement Income Security Act of 1974 ("ERISA" or the"Act", 29 U.S.C. §§ 1006, et seq.). In particular, it arises under the provisions of 29 U.S.C. Section 1132 (c)(2), the regulations promulgated thereunder at 29 C.F.R. Parts 2560 and 2570. et seq., Secretary's Order 1-87, 52 Fed. Reg. 13, 139. The matter was heard before this administrative court on August 11, 1999 in Chicago, Illinois.

Exhibit A

I. Statement of the Case - Jurisdiction:

On November 2, 1998, the undersigned approved a decision and order approving settlement agreement and stipulation for dismissal and order (hereinafter, "decision and order," referring to the document signed by the undersigned, and "settlement agreement," referring to the attached settlement document signed by the parties.) (JX 1) The decision and order provided that, "The Complainant agrees to dismiss with prejudice the claims against the Respondent in exchange for Respondent's payment of the amount set forth in the settlement agreement to be made by December 31, 1998, and fulfillment of all other terms of said agreement."

The decision and order specifically provided that, "The Court shall retain jurisdiction over this action for purposes of enforcing the terms of this settlement agreement ... until Respondent's have (sic)[1] fulfilled the provisions of 1(a) through (f), after which ... time this action shall be dismissed with prejudice." (JX 1) This section was followed by footnote 1, thereto, which stated in full:

> The Court agrees that if the Respondent do not provide the final versions of the revised Annual Report Forms 5500 C/R, the participant benefit statements, and the Summary Annual Reports on this schedule, or in the event of a dispute regarding whether or not Respondent have submitted these documents in acceptable form, the matter will be submitted to the undersigned Administrative Law Judge for resolution. If the Administrative Law Judge finds that the documents have not been submitted on schedule, or resolves a dispute as to the acceptability of the forms in favor of PWBA, he may assess additional appropriate penalties based on all the facts and circumstances after providing the parties an opportunity to be heard, and the Department is not bound by the terms of (2)(a) and (b).[2]

On February 16, 1999, the Complainant, U.S. Department of Labor, Pension and Welfare Benefits Administration (PWBA or "Department") filed a motion for sanctions and penalties for the failure of the Respondent to submit satisfactory Annual Report Forms 5500 C/R, and the failure to submit 1995 and 1996 Participant

---

[1] The parties stipulated in the settlement agreement that, "Respondent Current Development Corporation ("CDC") is the plan administrator of the Plans. [Plan 001:the Profit Sharing Plan and Trust, and Plan 002: the Money Purchase Plan and Trust. (J X 21)] George Paul Klein, Jr., is CDC's principal and a trustee and fiduciary of the Plans. "Respondent" will refer to "CDC," herein. "Plans" refers to Plan 001 and Plan 002 collectively.

[2] "(2)(a) and (b)" refers to conditions which would remain in effect in the event of Respondent' failure to fulfill the terms of the settlement agreement. "(2)(a)" concerns the sections of the settlement agreement related to Respondent /Department's agreement to withdraw the September 23, 1998 subpoena and termination of "the current enforcement action commenced in connection with the participant benefit statements once terms (1)(a) through (f) have been fulfilled." (2)(b) preserves DOL's position regarding the retention by the Plans of the Westmont Property, as stated in its letter of July 26, 1996.

Account Statements and 1995 and 1996 Summary Annual Reports to the Plan participants by December 31, 1998, as provided in the terms of the settlement agreement. (JX 1) Complainant also contends that the Respondent failed to submit the agreed "compromised penalty payment of $15,000.00," on or before December 31, 1998, as provided therein. Respondent submits that its agent and accountant, Mr. Arneston, deposited into the mail box near it's offices the penalty check (JX 2) in the amount of $15,000.00 on December 31, 1998. The check was not postmarked until January 4, 1999 by the Post Office, and the certification of receipt of the check by the Department of Labor was dated January 7, 1999. (JX 14) Respondent also contends that drafts of Form 5500 C/Rs, participant account statements and summary Annual reports were timely submitted for review by the Department, but that errors were discovered that prevented submission of the finalized Plan reports.

In addition to the above, the settlement agreement specifically states:

> If the Administrative Law Judge finds that the documents have not been submitted on schedule, or resolves a dispute as to the acceptability of the forms in favor of the PWBA he may assess additional appropriate penalties based on all the facts and circumstances after providing the parties an opportunity to be heard ....

It is my opinion that the above cited terms of the decision and order, which incorporated the settlement agreement, specifically reserved to the undersigned jurisdiction over the entire matter until its terms and conditions had been fulfilled. This necessarily implies the authority to make determinations regarding the sufficiency of the fulfillment of the terms of the settlement documents. It is also my opinion that the alleged failure to fulfill these terms and conditions returned the status of the legal proceedings to the status quo ante, as it existed prior to the signing of the settlement documents, and that I remain empowered under the provisions of 29 U.S.C. Sections 1132 and 1135, and the implementing regulations set forth at 29 C.F.R. §§ 2570.60 through 2570.71 to make determinations and to levy the necessary sanctions and penalties required by statute in this proceeding. The agreement also provides that I may assess appropriate penalties in the event of the failure of the Respondent to abide by the terms of the agreement. Likewise, I have the authority, and the discretion, to consider the facts as presented by both parties, and to make determinations regarding the appropriateness of mitigating circumstances in considering the amount of the said penalties, within the scope of the exercise of that discretion.

II.   **Procedural History:**

According to the documents, (See, e.g., . . 1, p 2 of the attached settlement agreement), the matter began in 1993 when the Chicago Regional Office ("ChiRO"), of the Department of Labor's Pension and Welfare Benefits Administration ("PWBA"), commenced an investigation in connection with an investment in and retention of the "Westmont Property," by the Plans.   The property was a non-income producing piece of commercial real estate of 10 acres situated in Westmont, Illinois.   It was purchased in October, 1986, and represented approximately 50% of the total assets of the two Plans.   On July 26, 1996, ChiRO informed the trustees of the two Plans that its retention of the Westmont Property constituted a violation of § 404(a)(1)(B) of ERISA.

PWBA also informed the Administrator that there were violations for the Plans having failed to timely submit Annual Report Forms 5500 C/Rs for Plan years subsequent to 1991, in violation of § 104(a)(1).   The letter was referred to the PWBA's Office of Chief Accountant for resolution, but stated that no legal action would be commenced on retention of the Westmont Property at that time.   (JX 1, Attachment p. 2)

Two notices of intent to assess a penalty were filed on May 30, 1996, for failure of the two Plans to file Form 5500 C/R's for the Plan Years 1992 - 1994.   These were followed by statements of reasonable cause by the Respondent, and the agency responded with two notices of determination on statement of reasonable cause ("NODs"), which were not submitted to the two Plans until July 2, 1996.   These assessed $198,000.00 in total penalties for failure to file the reports for the Plan years of 1992 - 1994.   Respondent's answer of July 29, 1996 commenced the present action.

In addition to the above, on or about September 23, 1996, ChiRO commenced a separate enforcement action by issuing subpoenas to Respondent regarding the failure of the Plans to issue participation benefit statements subsequent to the 1991 benefit plan year, and to provide the statements pursuant to requests or under ERISA § 105(a), or the documents establishing the plans.

The matter was set for hearing by the undersigned, and pursuant to pre-hearing conferences between the parties and the undersigned, was postponed, and finally cancelled due to the above mentioned decision and order and the attached settlement agreement. That agreement provided for the Respondent to take the following actions:

(a) By November 13, 1998, submit revised 1992-96 Annual Report Forms 5500 C/R for the Plans that are acceptable to the Department.

(b) By December 1, 1998, submit draft participant account statements for all of the Plans' participants for plan years 1995 and 1996 to PWBA for review and comment.

-4-

(c) By December 31, 1998, send finalized versions of the participant account statements to che Plans' participants.

(d) By December 1, 1998, submit summary draft Annual Reports for plan years 1995 and 1996 to PWBA for review and comment.

(e) By December 31, 1998, send finalized versions of the 1995 and 1995 summary draft Annual Reports for the Plan participants.

(f) By December 31, 1998, pay a compromised penalty payment of $15,000.00 to the Department.

On October 16, 1998, Respondent submitted the draft Form 5500 C/Rs for the Plan years 1992 - 1994 for review and comment. (JXs. 2, 3 &4) On December 1, 1998, it submitted drafts of the Summary Annual Reports for the Profit Sharing and Money Purchase Plans 001 and 002 for the plan years 1995 and 1996, along with individual participant account statements for the same Plans and plan years. (J Xs 5 - 9) These submissions fulfilled the conditions of paragraphs 1 (b) and (d) of the settlement agreement, but not paragraph 1(a), which required the revised 1992-1996 Annual Report Forms 5500 C/R, be submitted that are acceptable to the Department by November 13, 1998.

On November 18, 1998, Respondent submitted finalized, signed and dated Form 5500 C/R reports for the Plan 001 and Plan 002 plan years 1992 - 1996. (JX 11 - 13) These finalized Form 5500 C/R's were due on November 13, 1998, and were, therefore five days late for the submission, and in technical non-compliance. No reasons were stated for the late submissions, and there was no evidence presented that an extension had been sought for the late submissions.

The above cited letter of transmission for the compromised $15,000.00 penalty check was received by the Department of Labor on January 7, 1999, in an envelope postmarked January 4, 1999. The cover letter of transmission, signed by Accountant Ken Arneson, was dated December 31, 1998. (JX 14) Facially, the submission of the $15,000.00 compromised penalty was not in compliance with the settlement agreement to "pay" that amount, "By December 31, 1998 . . . ."

Under cover of a letter from Mr. Arneson to Complainant's attorney, Mr. Durovic, dated April 1, 1999 and postmarked April 2, 1999, Respondent submitted copies of finalized individual participant benefit statements for participants of Plan 001 for the years 1995 (JX 16) and 1996 (JX 17), and Plan 002 for the years 1995 (JX 17) and 1996. (JX 18) These individual benefit statements were due on December 31, 1998, and their late submission

in April 1, without obtaining an extension of time to do so, was in substantial non-compliance with the terms of the settlement agreement.[3]

In other words, on the face of the documents submitted in accordance with the terms of the settlement agreement, the Annual Report Forms 5500 C/Rs and the compromised penalty check payment were in technical non-compliance, and the individual participant account statements were in substantial non-compliance, in violation of the terms of the decision and order attached settlement agreement.

Facially, since the terms of the settlement agreement had been abrogated, I would be within my discretion to begin with the $198,000.00 penalty originally imposed on the Plan Administrators, for failing to timely submit the respective documents, and to carry the daily penalty formulas forward, and subject to an additional daily penalty, and to consider other sanctions to be awarded for the delinquent responses. However, the Respondent has interposed certain defenses and mitigating factors which will be considered within the powers of my discretion under the statutory and regulatory provisions as set forth herein, as well as the points contra of the Department.[4]

IV. The Testimony:

George Paul Klein:

Mr. George Paul Klein, testified that he has been President of Current Development Corporation, since its inception in 1978, and Administrator of the two plans until the day of the hearing on August 11, 1999. (T 37 - 38)  GreatBanc Trust Company of Aurora, Illinois, was to have taken over as Trustee of the Plans on that date.  There has been no additional evidence submitted to the effect that it did not assume the position as administrator and/or fiduciary of the Plans, so I will assume that it did, with no effect on the final outcome of this proceeding.

Mr. Klein testified that the law firm of Bell, Boyd and Lloyd (hereinafter, "BB&L") prepared the original Form 5500 C/Rs for the Plans, which arrived in his office on the evening of November 12, 1998, in care of Current Development Accountant, Ken Arneson, who had been working with the law firm on them. (T 39) They were presented to Mr. Klein by Mr. Arneson on November 13, 1999 for review and signature.  When he reviewed them, he found several problems, which he communicated to the law firm, and assumed they

---

[3]The parties also submitted into evidence the First Amendments to the Profit Sharing Plan and Trust, (J X 20) and Money Purchase Plan and Trust, (JX 21) as both were amended on October 1, 1989.

[4]I take note of the fact that the substantive basis of the finalized documents have not been called into question by the Department.  I, therefore, will assume that they are now correct and reliable documents, and otherwise in full compliance with the provisions of ERISA. This is important, as it represents the ultimate goal of the Act, and may be considered in my review of the penalties imposed for the late submissions.

had taken care of the filing date with the Department. He executed them on November 7, 1998, and gave them to Mr. Arneson for mailing. He did not know until the Department's motion for sanctions that there was a problem with them as having been late filed. (T 41)

Mr. Klein testified that he also knew that the finalized participant account statements were due on or before December 31, 1998, and that the preliminary statements had been sent out. He testified that he was concerned with their accuracy, and that they, "educated" themselves on their accuracy. (T 42 – 43) He had Mr. Arneson review the manual "work papers" (spread sheets) from the years in question, and compare them with the typewritten ledger entries. (T 43) None had been computerized, so when they compared the manual and typewritten sheets, they found several errors, with improper reconciliation of the years in question with the prior years. (T 43) He had Mr. Arneson review all of the bank statements and any statements in the archives that had a dollar figure related to the two Plans, checking the profit calculations, the contributions to the Plans, and even the hours that every participant had worked, considering the annual 1,000 hour qualification requirement for participation in the Plans. They also had to compare the fiscal year working hours with the calendar years worked for each employee, and make necessary corrections. Their fiscal year begins on October 1st, so they had to remove the fourth calendar year quarter from one year and add it to the first three quarters of the following year to arrive at the 1,000 hour qualification in the correct fiscal year. ((T 44 – 45) This caused corrections to be made in all of the years involved in the recalculations, with different vesting results.

Referring to Mr. Arneson as, "the most computer literate accountant that the company has ever had," he had him devise a set of programs to accommodate the changes and he ended up drafting an entire new set of reports for the years in question. The original draft statements had been drafted manually, and then typed. (T 46 – 47) In terms of years in which reports were submitted, and those in which there were none, they began with 1992. 1991 statements had gone out. They began with the 1992 fiscal year, which began in October of 1992, and extended through September of 1993. (T 52) He testified that, "it's not that they didn't go out because there were errors, the accountant we had at the time, I never took the time to manually take the information from the work papers, put it on statements and get it out. So we did find work papers in folders we just – but the statements had not been mailed." He did not know why it did not go out. (T 53)

Mr. Klein testified that following the 1992 fiscal year, they had to recalculate each of the following fiscal years, for 1993, 1994, 1995 and 1996. Then they had to also do the 1997 statement, so that was also done and submitted. (T 54) With these calculations, Mr. Arneson was able to finalize the individual participant benefit statements, and they were all submitted under

cover of the letter of April 1, 1999, which was postmarked on April 2, 1999. (T 54; J 15 - 19)

In December, 1998, between Christmas and New Year's, they realized that they were not going to make the December 31, 1998 deadline, and so notified BB&L. BB&L told them to just send out the inaccurate copies, which he felt that they could not do. He told BB&L to notify the DOL, but they were against doing so for an extension. (He was then talking to Ray Fay of BB&L's Washington office, for whom attorney Bonita Hatchett did some of the actual work on their account, but had since left the firm. (T 56 - 58) Ms. Hatchett's name is on the November 18, 1998 submissions. It was not clear who was handling the Current Development account at that time.) The reason that the rest took until April, 1999, was the amount of work that had to be done on the individual work papers which cover ten Plan years. (This was two Plans times five years.) They had to cancel vacations in order to get the work done. (T 59)

The Plans were formed in 1979, with two amendments. (T 61) The first amendment is dated 1989, although he said 1987, and he testified that there was another in 1991. The record contains the 1989 First Amended Plans. (JX 20 and 21) Vesting requirements were changed, and had to be considered in the 1992 reports, which had an effect on when they were hired before 1992, which also had generated mistakes. Other mistakes involved allocation of expenses. (T 61 - 63)

On cross-examination, Mr. Klein stated that he did not know of the sending of the preliminary drafts of the Form 5500 C/Rs on October 16, 1998, and was shown the cover letter by Mr. Ray Fay of BB&L to Mr. Durovic. (T 70; J X 2) He also testified that he had not seen the November drafts prior to their submission by BB&L to Mr. Anderson for Mr. Klein's signature. (T 71) He remembered discussions relative to not having seen the initial drafts, and telling Mr. Arneson that he needed to create statements that would show they were working on statements. (T 73)

Mr. Klein acknowledged issuing participant benefit statements through 1991, but could not answer why they had ceased thereafter. (T 73) In response to questions as to why they did not begin issuing them in later years, he responded: "I guess we got too busy doing other things." He added that he found work papers from the intervening years, but couldn't explain why his accountants had not gotten the statements out. He did say that he, "took full responsibility for not having gotten them out." (T 75)

Mr. Klein acknowledged that he had received a written request for a participant statement from former employee, Ms. Palaro. (T 76)

Mr. Klein testified that when he was hired in 1995, Mr. Areson was told that they were behind on participant statements, and they had to be gotten out as quickly as possible. However, work was not begun on them in 1995 due to other priorities. (T 81) Contributions to the money purchase plan are required at the rate of 10% of an eligible employee's reported wages in a particular year. He gave Mr. Arneson the Plans to read. That was all that was done at that point. (T 83 - 84)

Mr. Klein stated that BB&L was responsible for not asking for an extension on the December 31, 1999 reporting requirements under the settlement agreement. He stated that this court may not hold them responsible, but that he sure did so. (T 84)

Kenneth Arneson:

Accountant Kenneth Arneson testified that he was hired in March, 1995, and worked for about a year with a CPA who was hired to do work on an apartment complex of Current Development, but was put on the pension and profit sharing plans for about a year when the problems arose. (T 90 - 91) He (Mr. Arneson) became involved with the Plans when they signed the settlement agreement, and Mr. Klein asked whether they could meet the dates set forth in the settlement agreement. Mr. Arneson told him that, since he had not been involved with the Plans, he felt that it would be very difficult. (T 91) He acknowledged that he was the one that had received the completed 5500 C/Rs on November 12th, as set forth in the letter from BB&L of that date. (T 92: J X 1). He did not recall discussing them with Mr. Klein on the 12th, but did so on the next day. He then had questions and discussions with BB&L, had certain questions answered, gave them to Mr. Klein for signature on November 17th, mailed them (by Mr. Arneson), (T 94) and they were received on the 18th.

Mr. Arneson prepared the $15,000.00 compromised penalty check on December 31, 1999 because that was the date on which he was directed to prepare it. (T 95) He described the process for its preparation, initialed it, and used Mr. Klein's stamp on it. He placed it into the envelope, put a stamp on it, and took it to the mailbox at 4:30 p.m., addressed by him to the Department of Labor. (T 95) A picture of the mailbox is shown in Joint Exhibit 2. He testified that the time for last pick-up is shown to be "Five o'clock." (T 96) The mailbox clearly states on the front of it, "Last Collection, 5 p.m., Monday through Friday." (JX 2) [Mr. Arneson demonstrated during the entire course of his testimony that he was a forthright and credible person. Nothing in his actions or demeanor gave me any reason to doubt the veracity of his testimony on this point. I credit his statement on the matter, and conclude that he did deposit the check in the said mailbox on Thursday, December 31, 1999, at on or about 4:30 p.m.; that it was not picked-up on that date, and that, due to the intervening New Year's holiday on Friday, January 1, 1999, and the weekend of January 2 and 3, 1999, the pick-up was not made until January 4, 1999, at which time the parcel was postmarked with that date, and

-9-

subsequently delivered to the DOL on or about January 7, 1999. This is a separate question from the question of whether the Respondent was obligated to have had the check delivered to the DOL, "By December 31, 1998..." which was the date set forth in the settlement agreement, as specifically stated therein, which will be hereinafter discussed as a matter of law.   Note: Settlement agreements are contracts.   This one obligated the Respondent to have the check delivered to the DOL "By December 31, 1998."   That was not done, and constituted a breach of the settlement agreement, on the face of the transaction.

It was a mistake on Mr. Klein's part to direct that a check that was due "By December 31, 1998," be mailed on that date.   Such a mailing could not physically be received by that date.   The failure to do so warrants the payment of an additional penalty, which I conclude should be that stated by the Department in the amount of $2,100.00, for a total amount due on the compromised penalty of $15,000.00 + 2,100.00 or $17,100.00]

Mr. Arneson acknowledged that it was he who prepared the participant statements, (T 96) and verified the course of action that was set forth by Mr. Klein in his testimony, in terms of the work sheets that he reviewed, and gave to the secretary for final typing. He did not know whether BB&L had received DOL approval of the draft statements. (T 97)

To prepare the finals, he followed the procedure described by Mr. Klein, (T 98) He used an older version of a "Lotus" computer program to prepare them, but in the conversion from the old to the new version of "Lotus" there were too many errors, and he had to prepare them manually. (T 98) He did the Plan years 1992 - 1996, and had contact with Bonita Hatchett at BB&L to do so. He told her that he would not be able to get them done by December 31, 1998, prior to that date. (T 99) He testified that he had two conversations with Mr. Durovic after December 31, 1998, and continued to load the information onto the Lotus spreadsheet. He was making continuous corrections after reviewing numerous documents as described by Mr. Klein, and entered them on spreadsheets as set forth in Respondent's Exhibits 3 and 4 for the two Plan years 1996, ending September 30, 1997. (T 100 - 101.) [Since no questions have been raised about the accuracy of the final documents, and the changes that needed to be made, including formula errors as they related to individual participant account errors, as set forth in Mr. Arneson's testimony, I will not review them in detail. (T 103 - 111) In so doing so, I find them to be accurate representations of the condition of the two Plans, as of September 30, 1997.   In addition, I do not question the time that was necessary to devote to the documents from December through the submission of the documents in April, 1999. (T 113 - 114)

With regard to the conversations with Mr. Durovic, he testified that he talked to him once in January, and then in February. He said that in the first, he had answered the questions about the 1992 and 1993 documents, and that he was not sure when

-10-

they all would be completed. He testified that he told him that he was working as fast as he could, and hoped to be finished by the end of January or early February. In the beginning of February, he told Mr. Durovic that they were further along, but not finished with 1995, and did not know when they would be completed. (T 116 - 117) He then recounted all of the problems in finishing the documents, with specific reference to individual participants, including Ms. Palaoro, (T 117 - 121) and continued on with other individual accounts. (T 121 - 126).

The documents were finally finished, and he mailed the individual participant account statements for all of the Plan years due, on April 1, 1999. (T 127) He mailed the individual participation benefit statements for Plan year 1997 about two weeks later, (T 127) which they were able to do as a result of the computerization work that had been done for the previous Plan years. (T 128) He did not receive any objections from any of the individual participant statements that were sent out. (T 128) However, Mrs. Palaoro did write a letter dated April 26, 1999, requesting various documents. (T 129 - 130) They responded to her letter on August 6, 1999. (T 131)

Correcting his prior testimony on mailing the November documents, Mr. Arneson testified that he first mailed the documents to Ms. Hatchett at BB&L. (T 133) He verified again that he was authorized to mail the check for $15,000.00 on December 31, 1998. (T 133) The authorization he received to do so was the settlement agreement itself. (T 134) He also specifically identified the mailbox in Respondent' Exhibit 2 as the one that he used every day. (T 135)

The name of the other accountant [the CPA] that Mr. Areson worked with was David Null. (T 139)

Mr. Arneson verified that individual participant account statements were sent to all of the participants for the years 1992 - 1996, but that only the years 1995 and 1996 were sent to the DOL because that is all that the settlement agreement called for. (T 145)

Mr. Arneson confirmed that he (they) did not respond immediately to Mrs. Palaoro's letter of April 26, 1999. (T 148) In August, 1999, [just before the hearing] they sent her the 1992 - 1996 participant account statements and the annual reports, which had been sent to participants in April, together with the worksheets, as well as some additional information on wages and expense information for the same years. (T 149)

Joanne Palaoro:

Ms. Palaoro testified that she began work for Current Development in January, 1986, and ceased work there on July 29, 1992. (T 152) She became a member of the Plans 1987, for which she received an annual, individual participant statement through 1992, but they ceased after that. (T 152 - 153)

Ms. Palaoro stated that she received the 1991 statement in 1993. Plan years 1990 had three revisions and 1991 had two after that. She left on July 29, 1992, and made her first request for the 1992 annual statements and Plan summaries regarding where her money was invested in August of 1992. (T 153) George Klein responded to the first, stating that they had discovered some errors in it, following which she made several requests for the information. (T 154) She sent letters periodically over a period through 1995, when she made her final request. (T 155) She did not receive any other responses. (T 156)

Ms. Palaoro had served in several positions with both George and Elaine Klein, the latter being Mr. Klein's wife. She was assistant secretary to George and Elaine; executive secretary to George and to the personnel administrator who reported to George. She was the liason between George and the Arbor Club, and payroll clerk, throughout which she was an hourly paid employee. (T 157)

Charles Olson was the accountant then, and was quite thorough. He would seek payroll information for the Plans, and had worksheets on them. (T 158) She would interview new hires and make recommendations on them, while providing them with necessary paperwork, such as social security cards. She maintained all of the personnel records, and kept those records herself. (T 159)

With regard to the above requests, she was seeking the worksheets of the accountant to come up with the necessary figures for her own retirement. She also wanted to know the investments and their value. She stated that the April 26, 1999 responses and information basically contained all of the information that she already had. (T 160) She had questions on them, and felt that some were wrong. (T 160) Mr. Klein did not pay her wages until 1997, after a long court battle, and she questioned the wage base amounts that had served as the basis for her contributions. She does not know whether the figures were correct or not. (T 161)

She has contacted other former employees to discuss their contributions, and stated that she had received letters from them that they had sent requesting information from George, and telling her that they had not received it. (T 162 - 163)[5]

_____

[5]The Exhibits: Although Ms. Palaoro testified about these letters, they were not offered into the record, and had not been produced in accordance with the pre-hearing order. However, the Respondent submitted a chronological history of correspondence regarding Palaoro, CDC, and the Plans, (R X 7) which was received into evidence without objection, along with Respondent's Exhibits 1 - 6, except for the picture of the mailbox in Exhibit 2, which has also been received by virtue of Mr. Arneson's testimony on the subject. (T 96) To the extent that the demands described by Ms. Palaoro are deemed necessary to the imposition of any penalties for the refusal to supply the documents based upon her request as a participant, Respondent' Exhibit 7 is deemed to constitute a verification of the testimony of Ms. Palaoro concerning those

-12-

that she maintained to obtain the copies of the driver's licenses that she always made of new hires, to update or verify information that she was typing, including Workers' Compensation files and annual file information. (T 170 - 171) Her recent telephone complaints concerned the return on the investments of the Plans, and where the money was invested, and she complained that they never got any of that information. (T 172) She admitted that when she received the Form 5500 C/Rs in April, that they contained a section on the assets of the Plans, but claimed that she did not know how to read those sections. (T 173) Mrs. Palaoro did not review the accuracy of the materials brought to Mr. Klein that the accountant, Charles Olson had prepared, so she could not verify its accuracy. (T 169)

Ms. Palaoro admitted that the Kleins were in the business of investing real estate, and that they would be interested in returns on such investments, but claimed that their interests were not the same as their own. (T 175) She also confirmed that the Plans were 100% contributory by the employer. (T 176) She stated that she had a general knowledge about the investment in the Westmont property by the Plans, and that to the point in time of the hearing that it had not generated any income. (T 178)

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Based upon the testimony and documents submitted for consideration in this case, I find the following facts to have been clearly established:

1. The decision and order, and its attached settlement agreement were made contingent upon the fulfillment of all of their terms and conditions.

2. Prior to the approval of the settlement agreement, as part of those negotiations, Respondent submitted draft 1992-1996 Annual Report Forms 5500 C/R for the two Plans for review.

3. However, Respondent did not submit the finalized (signed), revised 1992-1996 Annual Report Forms 5500 C/R for the Plans that were acceptable to the Department on or before November 13, 1998, but instead submitted them on or November 18, 1998.

4. Respondent <u>did</u> submit draft individual participant account statements for all of the Plans' participants for Plan years 1995 and 1996 for review and comment by December 1, 1998.

---

requests. Note: Claimant's Exhibits 1 & 2 were also offered into evidence, but were the subject of an objection and withdrawn at the close of the hearing. (T 11 & 183) Joint Exhibits 1 - 21 were the subject of a joint stipulation, and all received into evidence as a part of the record in this matter. (T 10)

cipant account statement to the Plans' participants by December 31, 1998, but, instead submitted them to the Plan participants on or after April 1, 1999.

6. Respondent <u>did</u> submit summary draft Annual Reports for plan years 1995 and 1996 to the Department for review and comment by December 1, 1998.

7. Respondent did not send finalized·versions of the 1995 and 1996 summary draft Annual Reports for the Plan participant by December 31, 1998.

8. Respondent did not pay the compromised penalty payment of $15,000.00 to the Department by December 31, 1998. However it was paid on January 8, 1999.

9. Respondent neither requested nor obtained extensions of time for the late submission of any of the said Annual Report Forms 5500 C/Rs, summary Annual Reports, or the individual participation account summaries, either before their original due dates in the respective years for which the reports and summaries were due, or in response to the due dates set forth in the settlement agreement.

10. Respondent did not offer an explanation of reasonable cause for its failure to submit Annual Report Forms 5500 C/Rs when due for the Plan years 1992 - 1996, for both Plans 001 and 002.

11. Respondent did not offer a reasonable explanation for its failure to submit the Summary Annual Reports, cr participant beneficiary statements when due to individual Plan participants, for the Plan years 1995 - 1996, for both Plans 001 and 002.

12. Respondent did not offer an explanation of reasonable cause for its failure to submit Annual Report Forms 5500 C/Rs when due under the terms of the settlement agreement, by November 13, 1998 for the Plan years 1992 - 1996, for both Plans 001 and 002.

13. Respondent did not offer an explanation of reasonable cause for its failure to submit Summary Annual Reports, or participant beneficiary statements when due to individual Plan participants under the terms of the settlement agreement, for the Plan years 1995 - 1996, for both Plans 001 and 002.

## CONCLUSIONS OF LAW

1. The undersigned has jurisdiction of this proceeding under the terms of Section 502(c)(2) of ERISA, 29 U.S.C. §§ 1132(c)(2), as implemented by the provisions of 29 C.F.R. §§ 1250.502c-2 and 1270.60 - 1270.71.

of the Respondent and it attached settlement agreement entered into by all the parties under the provisions of 29 C.F. § 2570.65, which provided that the undersigned would retain jurisdiction over the matter pending compliance with all of its terms and conditions. A settlement agreement constitutes a contract between the parties thereto, and is to be interpreted as a question of contract law. J.B. Steel v. United States, 810 Fed. Cir. (1987); Greco v. Department of the Army, 852 F.2d 558, 560, (Fed. Cir. 1988). If the terms of the agreement are clear and unambiguous, those terms control the agreement, and the interpretation of its intent. Carson v. Department of Energy, 77 M.S.P.R. 453, 457 (1998). Here, the question of the intent of the parties concerning the retention of jurisdiction by the undersigned pending fulfilment of the terms and conditions of the agreement, is clear and unambiguous.

3. The penalties provided under the provisions of Section 502(c)(2) of the ERISA are civil penalties, as are any basic penalties that may be imposed by the undersigned for the failure of the parties to comply with the terms and conditions of the Respondent, and the attached settlement agreement. Due to the conditions of the settlement agreement, the motion for sanctions and penalties constituted appropriate notice to the Respondent that the Complainant was seeking penalties and sanctions. Complainant's characterization of the penalties and sanctions does not bind this administrative court.

4. In addition to penalties that may be statutorily imposed by the undersigned for failure to fulfill the terms and conditions of the order and settlement agreement, the undersigned may impose sanctions for the extraordinary results of this failure, including the imposition of costs and attorneys' fees. See, Kokken v. Guardian Life Insurance, 511 U.S. 375, 380 (1994). In addition to the reservation of jurisdiction in the agreement, it is my opinion that this Administrative Court has an 'inherent power" to interpret and enforce its own settlement agreement orders. This, then, would be particularly so in those over which it has reserved its jurisdiction to insure compliance, and without which parties could unnecessarily delay the administrative proceedings contemplated by ERISA for the protection of individual plan participants.

5. By the above findings of fact, it is my conclusion, as a matter of law, that the Respondent has violated the terms and conditions of not only the decision and order and the attached settlement agreement, but the provisions of 502(c)(2) of ERISA in the following respects: (1) Its most serious violation was the failure to submit the finalized Summary Annual Reports and participant beneficiary statements for the Plan years 1995 - 1996 by December 31, 1998, under the terms of the above agreement, which it did not do until after April 1, 1999.[6] (2) It also failed to

---

[6]Strangely enough, under the provisions of paragraphs (1)(b) and (1)(d) of the agreement, Respondent was required to submit drafts of the Plan years 1995 and 1996, participant beneficiary account statements and Summary Annual Reports for review by December 1, 1998, which it did do. PWBA notified Respondent that the submissions were

1992 – 1996, and then by November 13, 1998, under the terms of the above agreement without timely request for an extension or submission of a statement of reasonable cause for so doing. (3) It then failed to submit the penalty check by December 31, 1998 as provided under the terms of the agreement.

6. I find, as a matter of law, that due to the reservation of jurisdiction as set forth in the settlement documents, the failure to submit timely reports, statements and penalties by the dates set forth therein constituted acts that clearly violated, and failed to fulfil, the terms and conditions of the decision and order and the attached settlement agreement, and that those actions were clearly within my authority to consider the entire matter, as if there had been no agreement.[7] It is my opinion that this includes the authority to consider the original action of the Department in making its determinations on the failure to submit the Annual Report Summary Forms 5500 C/Rs and the participant beneficiary statements for both Plans, and the original imposition of the $198,000.00 penalties for failure to do so. I may also consider the negotiation of the penalty by the parties to its $15,000.00 figure, and give credence to the validity of those negotiations, and reasons for their results, which I hereby do, on certain conditions, which will be set forth herein.

7. With regard to the Plan year submissions when they were due in 1992 through 1996, repeating Mr. Klein's testimony, "it's not that they didn't go out because there were errors, the accountant we had at the time ..., I never took the time to manually take the information from the work papers, put it on statements and get it out. So we did find work papers in folders ... – but the statements had not been mailed." He did not know why they did not go out. (T 53) [Unfortunately for Current Development Corporation and its Plans, while this was an honest, credible statement of the conditions which gave rise to the failures to file the Form 5500 C/Rs at the hearing, it also provided a facial justification for the imposition of penalties by PWBA for both the failure to submit the Form 5500 C/Rs and the failure to submit the individual participant benefit statements under 29 U.S.C. §1132(c)(2)(B) of the Code, since without those Annual Reports, accurate individual participant reports could not have been submitted to the participants. With regard to the reasons offered for the failure to timely submit the reports under the settlement agreement, Respondent contends that if they had been finalized, signed, and sent out by the days scheduled, that they would have been incorrect, as their own audit revealed mistakes that had been

acceptable and in compliance, but the finalized, signed documents were not submitted to the participants until April 1, 1999, and were received by them over the period of a few days after that.

[7]In, Wellman Thermal Systems Corporation and International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW), 269 NLRB 159, 116 LRRM 1227 (1984), the National Labor Relations Board remanded a matter concerning breach of a settlement agreement to the Administrative Law judge for a hearing wherein the agreement expressly retained jurisdiction "to review compliance of the parties."

made in early years of the Plans that had not been carried over
into succeeding years. Thus they claim an excuse from the penalties
based upon these discoveries, and resulting necessity for delays.
However, no timely excuse was provided for not having obtained an
extension on these latter dates, except that Respondent's law firm
neglected to do so, and has been fired for the failure. It is my
opinion that these issues concern the relationship between
Respondent and its attorneys, and otherwise may concern the weight
that may be afforded to the Respondent's arguments in favor of
consideration of the penalties, and not to whether they should have
been imposed in the first place. Under the Tenth Circuit's's
decision in Mootheart v. Bell, 21 F. 3d 1944 (10th Cir. 1994), which
is consideration of degree of injury is within the discretion of
the court in examining penalties awarded in the matter, and by no
means a mandatory consideration.*

8. In reviewing the documents and the testimony of the
witnesses, especially that of Current Development Corporation
President, George Klein, who was also the Administrator of the two
Plans during the period of the subject violations, there really was
no excuse for the failure to submit the reports and statements due
for the Plan years 1995 - 1996. I affirm the actions of the
Department in the investigation of the matter, and find as a matter
of law that the imposition of a fine of $198,000.00 on the
Administrator of the Plans was within the authority of the
Department, as implemented by the Secretary pursuant to the
provisions of 29 C.F.R. § 2560.502c-2. I also find that the
negotiation of the penalty as approved by the undersigned in the
decision and order approving settlement agreement in the amount of
$15,000.00, was reasonable, and may serve as a basis for a penalty
determination in this matter.

9. I further find that it is clearly within my authority to
impose the entire penalty for the failure to fulfill the terms and
conditions of the settlement agreement. However, since I have also
found that it was reasonable for the Department to negotiate the
$15,000.00 settlement of that penalty, I am issuing this order to
permit such payments as have been set forth herein within 30 days
of the date of the issuance of this decision and order, or such
other date as may be set by the Secretary upon review of this
decision. In the event that the amounts set forth herein are not
paid in full by that date, the negotiated $15,000.00 penalty is
withdrawn; the original penalty of $198.000.00 is awarded as a
penalty, and the additional amounts stated for late filing of the
subject documents are levied as additional civil penalties.

10. As the mailing of the penalty check for $15,000.00 on
December 31, 1998 rendered receipt of payment "by that date," as
set forth in the decision and order and attached "settlement

_____

*In light of the limited authority on the subject of a court's discretion on the imposition of ERISA penalties, with
or without the involvement of an alleged breach of settlement agreement as alleged here, my request for briefing of the
effect of Moothead at the hearing was addressed to this subject by analogy alone, and was not meant to imply that this
court had jurisdiction under Section 501(c)(1) of the Act.

agreement" an impossibility, I find that the clear, unambiguous wording of the settlement documents required the payment to be received at the Department "by that date," of December 31, 1998, and not "mailed" by that date as argued by the Respondent. Thus the question of the pick-up and postmark of the check is rendered moot. Simply stated, Respondent violated the terms of the agreement by not causing the check to be delivered to the Department "by" December 31, 1998, and is subject to a penalty of $300.00 per day for seven days, for a total of an additional penalty of $2,100.00, to be added to the amount of the penalty check, for a total amount due in the submission of that penalty of $17,100.00.

11. It is my determination that the three-month, late-submission of the individual participant beneficiary statements to the participants, warrants the imposition of a substantial penalty. Complainant, in its motion for sanctions and penalties, proposes that this be calculated at the full daily $100.00 per day rate for each participant in each of the two Plans, as shown in the Annual Reports. Such a penalty, calculated from January 1, 1999 to April 1, 1999 would virtually double the $1,048,100 total penalties calculated from January 1, 1999 to February 16, 1999, and exceed the total assets of the two Plans. My concern has been that Respondent did not appear to be conscious of the importance of these beneficiary statements to the individual participants in calculating their own personal disability and retirement portfolios, during the years in question, and even during the period of the delays being encountered during the preparation of these documents for the purposes of the settlement. The matter of the Westmont Property, which is not involved in this litigation, is an example. The problem with the investment in such a large asset as a dominant investment by the Plans, is that is simply not liquid, and its actual value is speculative, at best. As a non-income producing asset, it may not be counted upon in a given Plan year to produce any income, and, may not be easily sold. Participants must be able to rely upon access to the assets of the Plans, and to know what they are, and to know their precise value, for their own long term planning. It is unconscionable that the individual beneficiary participant statements were not produced from 1992 - 1996.[9] The penalties suggested, and their method of calculation are well justified. Likewise, negotiation of the lower amount of $15,000.00 to induce compliance via settlement was also justified. (I agree that the agency, and this court, must be able to rely upon the figures submitted by the Respondent concerning the numbers of such participants, a fact which was also, finally, recognized by the Respondent.)

---

[9]Respondent's own emphasis on this point in its brief is somewhat ironic, when it quotes the House Report on ERISA, citing the, "need for a more particularized form of reporting so that the individual participant knows exactly where he stands with respect to the Plan". (Respondent's Brief, p. 16)

12.  The Complainant's motion for sanctions and penalties seeks a $300.00 ( ) day penalty for the fail ? to submit the finalized Annual Report Forms 5500 C/R's for Plan years 1992 - 1996 due on November 13, 1998. These were not received until November 18, 1998, or five days after the due date.  Calculated at 10 reports, for 2 Plans, times 5 days, times $300.00, (the amount of penalty proposed by the Complainant as a sanction, with which I agree) the sum of this penalty/sanction is $15,000.00.  There being no specific motion or request for late submission of these documents, or justification by reasonable cause offered at the time of their submission, it is my determination that the justification offered at the hearing, that they were submitted to the law firm of Boyd, Bell and Lloyd, which was its agent for the submission, does not constitute "reasonable cause."  It is simply inadequate as a matter of law and is rejected as such.  Therefore, the amount of the penalty is reasonable, and accurately calculated, and therefore assessed in full, at the amount of $15,000.00.

13.  It is my determination that the Respondent, as Administrator for the Plans, is responsible for the violations of the Act, and the settlement agreement, as specifically set forth above, and that the following amounts must be paid as penalties therefore:

    The initial penalty levied by PWBA
    for failure to file the reports ............... $198,000.00

    The penalty calculated by the PWBA from
    January 1, 1999 through February 16, 1999.......1,048,100.00

    A doubling of he penalty calculated by the
    PBGA from February 17, 1999 through April
    4 - 6, 1999, the actual days of receipt of the
    documents.......................................1,048,100.00

    The penalty on the failure to have the penalty
    check delivered by December 31, 1999 ...........  2,100.00

    The penalty for the failure to deliver the
    Annual Report Form 5500 C/Rs by November 13,
    1998, which were delivered five days late on
    November 18, 1998 .............................. 15,000.00
    Total: ........................................ $ 2,311,300.00

This penalty is payable on the 31st day following the date of the issuance of this order.

he two Plans are now in compliance and the credible evidence that Respondent was diligently attempting to rectify the clear violations that it had caused, as is evidenced by the drafts that were timely submitted, in the event that the following are submitted on or before the 30th day following the date of this order, the above penalty of $2,096,200.00 ($1048,100.00 X 2) will be reduced to approximately 1% of that total, for an amount of $20,962.00, and the amounts set will be paid as satisfaction for all obligations:

The 1% of the $2,096,200.00 ..................... $20,962.00

The negotiated penalty levied by PBGA
for failure to file the reports ................. 15,000.00

The penalty on the failure to have the penalty
check delivered by December 31, 1999 ...........  2,100.00

The penalty for the failure to deliver the
Annual Report Form 5500 C/Rs by November 13,
1998, which were delivered five days late on
November 18, 1998 ............................... 15,000.00
Total: .......................................... $53,062.00

IT IS THEREFORE ORDERED that:

1.  In the event that the Respondent pays to the Complainant the 1% of the $2,096,200.00 penalty, the previously negotiated civil penalty the amount of $15,000.00, plus the late payment penalty of $2,100.00 and the penalty for late filing of the Annual Report Forms 5500 C/Rs of $15,000.00, for a total of $53,062.00, within 30 days of the date of this order, the Respondent's penalty obligations to the Complainant will be considered to be paid in full.

2.  In the event that the amount of $53,062.00 is not paid by the 30th day following the date of this order, on the 31st day following the date of this order, the full amount of the penalties and sanctions, in the amount of $2,311,300.00 must be paid in full.

THOMAS F. PHALEN, JR.
Administrative Law Judge

## NOTICE OF APPEAL

29 C.F.R. § 2570.118 provides that the decision of the administrative law judge shall become final agency action unless any dissatisfied party files an appeal with the Secretary within 20 days after issuance of the decision of the administrative law judge. 29 C.F.R. § 2570.119 provides that a notice of appeal to the Secretary shall state with specificity the issue(s) in the decision of the administrative law judge on which the party is seeking review. Such notice of appeal must be served on all parties of record. The final decision of the Secretary constitutes final action within the meaning of 5 U.S.C. 704.

#3

# CIVIL COVER SHEET

IS – 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**a) PLAINTIFFS**
ELAINE L. CHAO, Secretary of Labor,
United States Department of Labor

**DEFENDANTS**
Current Development Corporation, George P. Klein, Jr., Individually, and as Trustee of Current Development Corporation Profit Sharing Plan, and of the Current Development Money Purchase Plan, The Current Development Corporation Profit Sharing Plan and the Current Development Money Purchase Plan.

**b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** _____
(EXCEPT IN U.S. PLAINTIFF CASES)

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT** _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
Peter D. Brottman
United States Dept. of Labor
Office of the Solicitor
230 S. Dearborn Street, 8th Floor
Chicago, IL 60604 (312) 353-4454

**ATTORNEYS (IF KNOWN)**

# 03C 1792

## JUDGE LINDBERG

MAGISTRATE JUDGE SCHENKIER

DOCKETED MAR 1 3 2003

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)

- ☒ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury — Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **LABOR** | ☐ 850 Securities/Commodities/Exchange |
| | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☒ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS — Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)
Violation of employee plan fiduciary responsibilities under Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. 1001 et. seq.

**VII. REQUESTED IN COMPLAINT:**   CHECK IF THIS IS A CLASS ACTION ☐ UNDER F.R.C.P. 23   **DEMAND $** ___   CHECK YES only if demanded in complaint   JURY DEMAND ☐ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See instructions)   JUDGE ___   DOCKET NUMBER ___

DATE 3/12/03   SIGNATURE OF ATTORNEY OF RECORD [signature]